**RECORD NO. 16-1492**

In The

# United States Court of Appeals
### For The Tenth Circuit

## M.A.K. INVESTMENT GROUP, LLC,
## a Colorado limited liability company,

*Plaintiff – Appellant*,

**v.**

## CITY OF GLENDALE, a political subdivision of the State of Colorado; GLENDALE URBAN RENEWAL AUTHORITY, a Colorado urban renewal authority,

*Defendants – Appellees*.

_____

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### NO. 1:15-cv-02353-RBJ
### THE HONORABLE R. BROOKE JACKSON
_____

### BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE
### IN SUPPORT OF APPELLANT
_____

**Michael E. Bindas**
INSTITUTE FOR JUSTICE
**10500 NE 8th Street, Suite 1760**
**Bellevue, Washington 98004**
**(425) 646-9300**

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

The Institute for Justice is a non-profit, public interest law firm.  It has no

parent corporation and no stock.  Thus, no corporation owns 10% or more stock in

it.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE............................................1

ARGUMENT ..................................................................................2

I.     ADEQUATE NOTICE OF THE EXCLUSIVE STATE
     PROCEEDINGS FOR CHALLENGING A BLIGHT
     DESIGNATION IS ESSENTIAL BECAUSE IT IS UNDER
     STATE LAW, IN STATE COURT, THAT PROPERTY
     OWNERS HAVE THE ONLY REAL HOPE OF
     PROTECTING THEIR PROPERTY .....................................................3

         A.    The U.S. Supreme Court Has Refused to Seriously
               Enforce Federal Constitutional Protections against
               Eminent Domain Abuse ...........................................................4

         B.    States Can, and Do, Provide Heightened Protections for
               Property Owners .....................................................................8

         C.    When Property Owners Defeat Dubious "Blight"
               Designations and Other Forms of Eminent Domain
               Abuse, It Is Almost Always in State Court .............................10

         D.    Given the Heightened Protections Available under State
               Law, Notice of a Blight Designation, Its Consequences,
               and the Time within Which to Challenge the Designation
               Is Essential, Especially when the Procedure for Bringing
               that Challenge Is Exclusive .....................................................12

II.    ADEQUATE NOTICE IS PARTICULARLY IMPORTANT
     GIVEN THE DISPROPORTIONATE IMPACT THAT
     "BLIGHT" DESIGNATIONS AND EMINENT DOMAIN
     HAVE ON THE POOR....................................................................15

Appellate Case: 16-1492    Document: 010197678495    Date Filed: 02/21/2017    Page: 4

A.   "Blight" Designations and Eminent Domain
     Disproportionately Impact the Poor...........................................15

B.   The Poor Are Less Able to Obtain Counsel to Advise
     Them on the Implications of, and Procedures for
     Defeating, a Blight Designation.................................................21

C.   The Poor Are Less Able to Protect Their Property
     through the Political Process.....................................................24

CONCLUSION .......................................................................................27

CERTIFICATE OF VIRUS SCAN

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arvada Urban Renewal Auth. v. Columbine Prof'l Plaza Ass'n, Inc.*,
    85 P.3d 1066 (Colo. 2004)..............................................................11

*Bd. of Cty. Comm'rs v. Lowery*,
    136 P.3d 639 (Okla. 2006)................................................................9

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972).......................................................................13

*Benson v. State*,
    710 N.W.2d 131 (S.D. 2006)...........................................................9

*Berman v. Parker*,
    348 U.S. 26 (1954).................................................................*passim*

*Brody v. Village of Port Chester*,
    434 F.3d 121 (2d Cir. 2005) ....................................................2, 3, 12

*City of Long Branch v. Anzalone*,
    No. A-0067-06T2, 2008 WL 3090052
    (N.J. Super. Ct. App. Div. Aug. 7, 2008) .......................................1

*City of Norwood v. Horney*,
    853 N.E.2d 1115 (Ohio 2006) .......................................1, 9, 10, 14

*Cmty. Youth Athletic Ctr. v. City of Nat'l City*,
    164 Cal. Rptr. 3d 644 (Cal. Ct. App. 2013)....................................1

*Cty. of Los Angeles v. Glendora Redev. Project*,
    111 Cal. Rptr. 3d 104 (Cal. Ct. App. 2010).................................11

*Cty. of Wayne v. Hathcock*,
    684 N.W.2d 765 (Mich. 2004) .................................................8, 18

*Gallenthin Realty Dev. Inc. v. Borough of Paulsboro*,
    924 A.2d 447 (N.J. 2007) ...................................................................10, 14

*Kelo v. City of New London*,
    545 U.S. 469 (2005)...............................................................................*passim*

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989)...............................................................................13

*Lambert v. People of the State of Cal.*,
    355 U.S. 225 (1957)...............................................................................24

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)...............................................................................14

*Ownbey v. Morgan*,
    256 U.S. 94 (1921)................................................................................13

*Poletown Neighborhood Council v. City of Detroit*,
    304 N.W.2d 455 (Mich. 1981) ......................................................18

*Randazzo v. Harris Bank Palatine, N.A.*,
    262 F.3d 663 (7th Cir. 2001) ..........................................................23

*Salt Lake City Corp. v. Evans Dev. Group, LLC*,
    369 P.3d 1263 (Utah 2016)..............................................................8

*United States v. Friday*,
    525 F.3d 938 (10th Cir. 2008) .............................................. 22-23

## CONSTITUIONAL PROVISIONS

U.S. Const. amend. V......................................................................*passim*

U.S. Const. amend. XIV ..........................................................12, 14, 27

## STATUTES

Colo. Rev. Stat. § 31-25-102(1)................................................................20

Colo. Rev. Stat. § 31-25-103(2) .................................................................20

Colo. Rev. Stat. § 31-25-105.5(2)(b) .......................................................12

**OTHER AUTHORITIES**

Bernard J. Frieden & Lynne B. Sagalyn, *Downtown*, *Inc.:*
*How America Rebuilds Cities* (1989) ......................................................17

Catherine R. Albiston & Rebecca L. Sandefur,
*Expanding the Empirical Study of Access to Justice*,
2013 Wis. L. Rev. 101 (2013)..................................................................21

Colin A. Young, *For lead plaintiff,* '*What they did was wrong then*, *and it's*
*still wrong today*', The Day, June 22, 2015................................................7

Consortium on Legal Servs. & the Pub., ABA,
*Legal Needs and Civil Justice:  A Survey of Americans* (1994)
http://www.americanbar.org/content/dam/aba/administrative/legal_aid_indig
ent_defendants/downloads/legalneedstudy.authcheckdam.pdf .............22

Dana Berliner, *Looking Back Ten Years After Kelo*,
125 Yale L.J. Forum 82 (July 7, 2015)..................................................8, 9

Dick M. Carpenter & John K. Ross, *Testing O'Connor and Thomas:  Does*
*the Use of Eminent Domain Target Poor and Minority Communities?*,
46 Urb. Studs. 2447 (2009)...............................................19, 20, 22, 24

Ernest Burgess, *The Growth of the City: An Introduction to a Research*
*Project*, in *The City* (Robert E. Park et al. eds., 1925) ...........................16

Homer Hoyt, *One Hundred Years of Land Values in Chicago* (1933)...................16

Ilya Somin, *The Limits of Backlash: Assessing the Political Response to*
Kelo, 93 Minn. L. Rev. 2100 (2009)........................................................20

J. Wylie, *Poletown: Community Betrayed* 58 (1989) .............................18

Jeanne Charn, *Legal Services for All: Is the Profession Ready?*,
42 Loy. L.A. L. Rev. 1021 (2009) ...........................................................21

Jonathon S. Byington, *The Challenges of the New Defalcation Standard*,
88 Am. Bankr. L.J. 3 (2014) ....................................................................23

Justin B. Kamen, *A Standardless Standard: How a Misapplication of* Kelo
*Enabled Columbia University to Benefit from Eminent Domain Abuse*,
77 Brook. L. Rev. 1217 (2012) ........................................................20, 25

Kaitlyn L. Piper, *New York's Fight over Blight: The Role of Economic
Underutilization in* Kaur, 37 Fordham Urb. L.J. 1149 (2010) ...................20, 25, 26

*Protecting Property Rights after* Kelo:  *Hearing Before the House Subcomm.
on Commerce*, *Trade*, *and Consumer Protection*, 109th Cong. (2005)
(testimony of Hilary O. Shelton), http://action.naacp.org/page/-
/washington%20bureau/testimonies/Kelo.FINAL.pdf ............................................27

Restatement (Third) of Restitution and
Unjust Enrichment § 5 reporter's note g (Am. Law Inst. 2011)..............................23

Sara Sternberg Greene, *Race*, *Class*, *and Access to Civil Justice*,
101 Iowa L. Rev. 1263 (2016) ........................................................ 21-22

Loretta Lees, *The Ambivalence of Diversity and the Politics of Urban
Renaissance: The Case of Youth in Downtown Portland*, *Maine*,
27.3 Int'l J. Urb. Regional Res. 613 (2003).............................................15

Timothy Sandefur, *Mine and Thine Distinct:
What* Kelo *Says About Our Path*, 10 Chap. L. Rev. 1 (2006) ..................................5

Wendell E. Pritchett, *The "Public Menace" of Blight:
Urban Renewal and the Private Uses of Eminent Domain*,
21 Yale L. & Pol'y Rev. 1 (2003).........................................................16, 17, 18, 26

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The Institute for Justice (hereinafter "IJ") is a nonprofit, public-interest law firm committed to defending the essential foundations of a free society. It provides *pro bono* representation on behalf of clients nationwide whose core liberties have been infringed by the government.

IJ litigates regularly in the area of property rights and is the nation's leading legal advocate against the abuse of eminent domain. Notably, IJ represented the homeowners in the highly controversial *Kelo v. City of New London*, 545 U.S. 469 (2005), in which the U.S. Supreme Court upheld the use of eminent domain for private economic development. IJ has represented numerous other home- and small-business owners, at all levels of federal and state courts, against abusive eminent domain practices. Many of these cases have involved government's abuse of "urban renewal," or "redevelopment," laws like the Colorado law at issue in this case. *E.g.*, *City of Norwood v. Horney*, 853 N.E.2d 1115 (Ohio 2006); *Cmty. Youth Athletic Ctr. v. City of Nat'l City*, 164 Cal. Rptr. 3d 644 (Cal. Ct. App. 2013); *City of Long Branch v. Anzalone*, No. A-0067-06T2, 2008 WL 3090052 (N.J. Super. Ct. App. Div. Aug. 7, 2008). IJ, moreover, frequently appears as *amicus curiae* in eminent domain cases nationwide.

Perhaps most relevant to the present case, IJ represented Bill Brody in successfully challenging the inadequate notice he received when the Village of

Port Chester, New York, attempted to acquire his property by eminent domain as part of a redevelopment project.  In that case, *Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005), the U.S. Court of Appeals for the Second Circuit held that the Village violated Mr. Brody's due process rights by failing to notify him of New York's exclusive thirty-day period for seeking judicial review of its determination that the project was for the "public use."  In the present case, the district court expressly rejected *Brody*'s reasoning.  Appx. 49-54 (Order at 11-16).[1]

IJ files this brief because it has a strong institutional interest in preserving the rule of law it secured in *Brody* and, more generally, in ensuring property owners receive notice that affords them meaningful opportunity to challenge the government's power to take their property.[2]

## ARGUMENT

MAK has amply demonstrated why the district court was wrong in holding that it was entitled to no notice of the blight designation that empowered Glendale to use eminent domain on its property, or of the exclusive thirty-day window within which MAK could challenge that designation under Colorado law.  IJ files

---

[1] References to "Appx." are to Appellant MAK's Appendix.

[2] IJ certifies that:  (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than the Institute for Justice, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

this amicus curiae brief to emphasize two additional reasons for reversing the

district court's judgment and for adopting the reasoning of the Second Circuit in

*Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005), an opinion joined

by then-Judge Sotomayor.  First, adequate notice to property owners is essential to

ensure they are not deprived of the substantive protections they are entitled to

under *state* law—protections that, in Colorado, exceed those available under

federal law.  Second, adequate notice is essential because "blight" designations and

subsequent exercises of eminent domain disproportionately impact the poor, who

are the least able to access legal counsel regarding the consequences of a "blight"

designation and are often politically powerless to defeat the designation through

the political process.

## I.    ADEQUATE NOTICE OF THE EXCLUSIVE STATE PROCEEDINGS FOR CHALLENGING A BLIGHT DESIGNATION IS ESSENTIAL BECAUSE IT IS UNDER STATE LAW, IN STATE COURT, THAT PROPERTY OWNERS HAVE THE ONLY REAL HOPE OF PROTECTING THEIR PROPERTY

Adequate notice of "blight" designations is essential in Colorado to ensure

that property owners are not deprived of substantive property rights protections to

which they are entitled under state law.  In a series of decisions culminating in

*Kelo v. City of New London*, 545 U.S. 469 (2005), the U.S. Supreme Court has

read the Fifth Amendment's "public use" limitation to be no limitation at all,

allowing governmental takings of private property for virtually any reason.  In

response to this disturbing trend, nearly every state in the nation—whether by statute, constitutional amendment, or judicial decision—has provided property owners greater protections against eminent domain abuse than the Supreme Court has been willing to give them. Colorado is one of those states.

But if property owners are not given adequate notice of the "blight" designations that give the government eminent domain power over their properties, the substantive protections that the states have adopted will be rendered meaningless where, as in Colorado, there is an extremely short period—and exclusive procedure—for challenging the designations. Unwitting property owners will, like MAK, miss out on their one and only opportunity for availing themselves of the protections that state law affords them. And the district court's answer to this problem—that property owners may still bring actions in *federal* court to challenge public use determinations under *federal* law—is no answer at all given the U.S. Supreme Court's adamant refusal to enforce the Public Use Clause of the Fifth Amendment.

### A. The U.S. Supreme Court Has Refused to Seriously Enforce Federal Constitutional Protections against Eminent Domain Abuse

Although the framers of the U.S. Constitution included significant protections against government's abuse of its eminent domain power—first among them, the requirement that the power not be exercised other than for "public use,"

U.S. Const. amend. 5—the U.S. Supreme Court has greatly eroded that protection over the last century.

"The most natural reading of the [Public Use] Clause is that it allows the government to take property only if the government owns, or the public has a legal right to use, the property . . . ." *Kelo*, 545 U.S. at 508 (Thomas, J., dissenting). "Early American eminent domain practice largely bears out this understanding": "[s]tates employed the eminent domain power to provide quintessentially public goods, such as public roads, toll roads, ferries, canals, railroads, and public parks." *Id.* at 511, 512.  And although, in time, courts upheld exercises of eminent domain by certain *private* entities, it was usually in situations involving public utilities or common carriers (*e.g.*, mills or railroads) that had a legal obligation to serve the public.  *See* Timothy Sandefur, *Mine and Thine Distinct:  What* Kelo *Says About Our Path*, 10 Chap. L. Rev. 1, 15-19 (2006).

The U.S. Supreme Court's decision in *Berman v. Parker*, 348 U.S. 26 (1954), however, marked a change in interpretation of the term "public use."  In *Berman*, the District of Columbia, pursuant to the Redevelopment Act of 1945, declared an enormous section of south-west Washington, D.C. "blighted."  The designation was made on an area-wide, rather than property-by-property, basis, and the Redevelopment Act authorized the District to use eminent domain to take any property in the area, regardless of whether that property was itself blighted.  *See id.*

at 28-30, 34-35.  The plaintiffs in the case owned a department store that was not

blighted but that the District sought to take as part of the redevelopment project.

The project was to be managed by a private, not public, agency, which would

redevelop the property for private, not public, use.  *Id.* at 31.

Nevertheless, the Supreme Court upheld the use of eminent domain and the

subsequent transfer of the property to private ownership.  *Id.* at 36.  In so doing, it

ignored the operative language of the Fifth Amendment, *i.e.*, "public use," and

instead asked whether the condemnation would serve a "public purpose"—a far

broader standard.  *Id.* at 32, 33, 34, 35.  The Court concluded that "blight" removal

was a public purpose and that "there [wa]s nothing in the Fifth Amendment that

st[ood] in the way."  *Id.* at 33.  *Berman* thus gave a green light to the "urban

renewal" fad of the 1950s and 1960s, which, as discussed below, targeted and

displaced hundreds of thousands of poor, largely minority, citizens throughout the

country.

While the Court adhered to an expansive interpretation of the Public Use

Clause in subsequent opinions, it took that interpretation to another level in *Kelo v.

City of New London*, 545 U.S. 469 (2005).  *Kelo* involved New London's use of

eminent domain to take homes and small businesses in the Fort Trumbull

neighborhood.  The homes and businesses were not "blighted"; rather, the city

simply desired new office and retail space as part of a plan to lure the Pfizer

pharmaceutical company into locating a new research facility in the area.  *See id.* at 474.  Specifically, the city intended to enter into a 99-year lease, for $1 in rent, with a private developer, who would construct the new facilities and, in turn, lease them to other private entities.  *See id.* at 476 n.4, 478 n.6.  The purported "public use" for the project was "economic development":  the idea that the new, private development might increase tax revenue and employment in the area.  *See id.* at 477, 483, 484.

In a sharply divided 5-4 decision, the Court held that the mere *possibility* of increased tax revenues and employment was a legitimate justification for taking the homes of Susette Kelo and her neighbors.  *Id.* at 487-88.  In so doing, the Court watered down the "public use" requirement even more than it had in *Berman*, suggesting that even a potential "public benefit" could justify using eminent domain to take a citizen's property.  *Id.* at 487.  And it adopted a level of near-absolute deference to the government, "declin[ing] to second-guess the City's considered judgments about the efficacy of its development plan" and its "determinations as to what lands it needs to acquire."  *Id.* at 488-89.[3]

---

[3] The "considered judgments" could have used some second guessing:  to this day, nothing has been built on the property that New London took; in fact, Pfizer pulled out of the city several years after the Court announced its decision.  The only "public benefi[ciaries]" of the takings are the feral cats that have taken up residence where the modest, albeit proud and well-maintained, homes once stood.  *See* Colin A. Young, *For lead plaintiff,* '*What they did was wrong then, and it's still wrong today*', The Day, June 22, 2015.

**B.    States Can, and Do, Provide Heightened Protections for Property Owners**

The Supreme Court did get one thing right in *Kelo*:  it recognized that the states are free to provide greater protections than the Supreme Court was willing to provide under the Fifth Amendment.  *See id.* at 489 ("We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power.").  Responding to a public backlash over *Kelo* itself, the states did just that.

While some states had already afforded property owners greater protection before *Kelo*, *see*, *e.g. County of Wayne v. Hathcock*, 684 N.W.2d 765 (Mich. 2004) (holding takings for economic development impermissible under the Michigan Constitution), some forty-four states—including every state in this Circuit save Oklahoma—reformed their laws, either by constitutional amendment or statute, to provide heightened property protections in the wake of *Kelo*.  *See* Dana Berliner, *Looking Back Ten Years After Kelo*, 125 Yale L.J. Forum 82, 84 & nn. 9, 10 (July 7, 2015) (collecting state reforms as of 2015).  Moreover, ten state courts of last resort—including Utah's and Oklahoma's—made it more difficult for government to engage in eminent domain abuse by making it harder to show a public use for a taking.  *See id.* at 88 & nn. 16, 17 (collecting cases through 2015); *see also Salt Lake City Corp. v. Evans Dev. Group*, *LLC*, 369 P.3d 1263 (Utah 2016).  And three of those courts—including Oklahoma's—explicitly rejected *Kelo*'s

reasoning. *City of Norwood v. Horney*, 853 N.E.2d 1115, 1140-41 (Ohio 2006); *Bd. of Cty. Comm'rs v. Lowery*, 136 P.3d 639, 647, 651 (Okla. 2006); *Benson v. State*, 710 N.W.2d 131, 146 (S.D. 2006).

Many of these state protections deal squarely with state "urban renewal," or "redevelopment," laws and make it more difficult for the government to rely on "blight" designations to demonstrate a public use for eminent domain purposes. For example, just within this Circuit, Colorado "requir[ed] clear and convincing evidence" that a taking is necessary to eradicate blight, Kansas "requir[ed] blight to be determined on a property-by-property," rather than area-wide, basis, and New Mexico "*prohibit[ed]* eminent domain for blight elimination."[4]  Berliner, *supra*, at 86 n.12 (emphasis added).

In short, the states—including Colorado and the others within this Circuit— took up the charge in the wake of *Kelo*, providing protections for property owners far beyond those of the judicially-gutted Fifth Amendment.

---

[4] The law made a narrow exception for antiquated platting issues in one particular area of the state.  *See* Berliner, *supra*, at 86 n.12.

**C.     When Property Owners Defeat Dubious "Blight" Designations and Other Forms of Eminent Domain Abuse, It Is Almost Always in State Court**

Given the protections available under state law and absent under federal law, it is hardly surprising that when property owners have defeated abusive attempts to use "urban renewal" and similar "redevelopment" laws to take their homes and businesses, it has been under *state* law, in *state* courts.

For example, in *Gallenthin Realty Development, Inc. v. Borough of Paulsboro*, a property owner successfully challenged, in the New Jersey state courts, an attempt to take its property under a state redevelopment law.  Wholly ignoring the U.S. Supreme Court's decisions in *Berman* and *Kelo*, the New Jersey Supreme Court held that under that state's constitution, government may not use eminent domain to take property simply because it is "stagnant," "not fully productive," or "not operated in an optimal manner."  924 A.2d at 460.

Property owners in *City of Norwood v. Horney*, were similarly successful in challenging, in the Ohio courts, a city's attempt to take their property under its urban renewal law.  The Ohio Supreme Court expressly rejected *Kelo* and held that, under the state constitution, using eminent domain to take property in an area simply because the area is "deteriorating" is impermissible.  853 N.E.2d at 1136, 1141, 1146.

10

And in *County of Los Angeles v. Glendora Redevelopment Project*, 111 Cal. Rptr. 3d 104 (Cal. Ct. App. 2010), the California Court of Appeal invalidated a redevelopment plan because its blight findings were not supported by "substantial evidence" and "tangible proof." *Id.* at 119-20, 131 (internal quotation marks omitted).  In contrast to the knee-jerk deference of *Kelo*, the court recognized that it must be "more than [a] rubber stamp[] for local governments." *Id.* at 120 (internal quotation marks omitted).

In fact, even before *Kelo* and the slew of state reforms that passed in its wake, property owners could sooner defeat a taking in state court, under state law, than in federal court.  *See*, *e.g.*, *Arvada Urban Renewal Auth. v. Columbine Prof'l Plaza Ass'n, Inc.*, 85 P.3d 1066, 1067 (Colo. 2004) (reversing judgment of condemnation because, under Colorado's Urban Renewal Law, once a parcel within an area determined to be blighted is sold, developed, and released by the urban renewal authority, the authority "may not exercise its condemnation power over any part of that parcel absent renewed findings of blight").

Comparing the results in these cases with the results in *Kelo* and *Berman*, it is clear that a property owner's best—perhaps only—chance at protecting her home or small business in the face of a dubious "blight" designation or other form of eminent domain abuse is in state court, under state law.

**D.     Given the Heightened Protections Available under State Law, Notice of a Blight Designation, Its Consequences, and the Time within Which to Challenge the Designation Is Essential, Especially when the Procedure for Bringing that Challenge Is Exclusive**

Despite these increased substantive protections, there is one way in which Colorado and a handful of other states[5] are famously stingy when it comes to property owners:  in giving them only 30 days to challenge a blight designation. This period begins to run immediately upon the 'blight" designation itself, and bringing a "civil action in district court for the county in which the property is located" is the *exclusive* means of challenging the designation—that is, of challenging the act that gives the government authority to use eminent domain. *See* Colo. Rev. Stat. § 31-25-105.5(2)(b).

In this light, it is critical that government provide property owners adequate notice when their neighborhoods are "blighted"—specifically, notice of the "blight" designation itself, of the fact that the designation authorizes government's use of eminent domain to take homes and business in the "blighted" area, and of the fact that property owners have only 30 days within which to challenge the designation.  The Due Process Clause of the Fourteenth Amendment, after all, protects a person's state-created property rights, as well her rights in state-created judicial proceedings concerning her property, and it requires both adequate notice

---

[5] One is New York.  *See Brody*, 434 F.3d at 125.

and a meaningful opportunity to be heard. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (holding that "[p]roperty interests" protected by the Due Process Clause "are created and their dimensions are defined by . . . independent source[s] such as state law"); *Ownbey v. Morgan*, 256 U.S. 94, 110 (1921) ("The due process clause . . . restrains state action, whether legislative, executive, or judicial, . . . [and] include[es] the right to be heard where liberty or property is at stake in judicial proceedings.").[6] Without adequate notice, unwitting property owners will inevitably miss their thirty-day window and never be able to avail themselves of the heightened substantive protections that state law affords them and their property.

In the present case, the district court dismissed this concern, reasoning that, once condemnation proceedings begin, a property owner can still bring an action in *federal* court to challenge the purported "public use" for the taking. Appx. 52-53 (Order at 14-15). The district court's reasoning misses the mark entirely. It is no answer that the unwitting property owner who misses out on her exclusive state-law remedy can still bring an action in federal court, because the federal action would be limited to determining whether there is a "public use" for the taking

---

[6] The district court's opinion assumes the clause protects only federal rights, *see* Appx. 52 (Order at 14), which is simply incorrect. *See Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (noting that interests protected by the clause "may arise from two sources—the Due Process Clause itself and the laws of the States" (internal quotation marks omitted)).

under the Fifth Amendment to the U.S. Constitution. *Kelo* and *Berman* would

govern that inquiry, and the property owner would get none of the benefits that

heightened state law protections would have provided.

      For example, in the absence of procedural due process, the property owner

could not argue, as the property owners in *Gallenthin Realty Development*, *Inc.* and

*City of Norwood* did, that the taking is not a permissible "public use" under the

*state* constitution. A New Mexico property owner, for example, could not argue

that, as a matter of state statute, eminent domain may not be used for blight

remediation. And a Kansas property owner could not argue that the taking is

impermissible because "blight" was not determined on a property-by-property

basis, as required by Kansas law. None of these post-*Kelo* state protections would

matter. Rather, *Kelo* itself, with its near-absolute deference to the government,

would control.

      To ensure that citizens are able to avail themselves of the protections that

state law affords their property rights—and, thus, to prevent "the risk of an

erroneous deprivation" of those rights, *Mathews v. Eldridge*, 424 U.S. 319, 335

(1976)—this Court should reverse the district court's holding that MAK was

entitled to no notice when its property was "blighted," Appx. 54 (Order at 16), and

instead hold that the Fourteenth Amendment required that MAK receive *adequate*

notice: that is, notice of the blight designation itself, of its consequences for

MAK's property, and of the 30-day period within which to challenge the
designation.

## II.   ADEQUATE NOTICE IS PARTICULARLY IMPORTANT GIVEN THE DISPROPORTIONATE IMPACT THAT "BLIGHT" DESIGNATIONS AND EMINENT DOMAIN HAVE ON THE POOR

Adequate notice of the exclusive state proceeding for challenging a blight
designation is important for another reason:  so-called "urban renewal," or "blight
removal," schemes and the takings associated with them disproportionately impact
low-income residents.  These are the very persons who are:  (1) least able to afford
counsel to advise them as to the potential consequences of a blight designation or
the limitations period for challenging one; and (2) often politically powerless to
defend their properties outside of the judicial system.

### A.   "Blight" Designations and Eminent Domain Disproportionately Impact the Poor

Eminent domain disproportionately affects the poor—those who are least
able to consult with (much less retain) counsel to determine what the consequences
of a blight designation are for their homes and businesses.  And this is by design,
as "schemes to attract the wealthy middle classes back to the inner city have
become central to urban redevelopment strategies."  Loretta Lees, *The
Ambivalence of Diversity and the Politics of Urban Renaissance:  The Case of
Youth in Downtown Portland, Maine*, 27.3 Int'l J. Urb. Regional Res. 613, 613
(2003).

In fact, the term "blighted" was first used in relation to cities—as opposed to plant disease—by the "Chicago School" of sociology, which employed scientific terminology to give a patina of objectivity to planning theories designed to displace the poor and minorities from cities. *See* Wendell E. Pritchett, *The "Public Menace" of Blight: Urban Renewal and the Private Uses of Eminent Domain*, 21 Yale L. & Pol'y Rev. 1, 15-17 (2003).[7]  These scholars, such as University of Chicago sociologist Ernest Burgess, argued that "excessive increase[s]" in population, such "as those which followed the great influx of southern Negroes" into Chicago after the First World War, resulted in "disturbances of metabolism" in the city, including a "speeding up of the junking process in . . . area[s] of deterioration." *Id.* at 17 (quoting Ernest Burgess, *The Growth of the City: An Introduction to a Research Project*, in *The City* 54 (Robert E. Park et al. eds., 1925)).  Economist Homer Hoyt similarly argued that "certain racial and national groups . . . cause a greater physical deterioration of property than groups higher in the social and economic scale."  Homer Hoyt, *One Hundred Years of Land Values in Chicago* 314 (1933).

It is hardly surprising, then, that *Berman*—the notorious case in which the U.S. Supreme Court upheld the use of eminent domain for the "urban renewal" of

---

[7] The U.S. Supreme Court later seized on this terminology, disturbingly implying that the poor, largely African-American neighborhood at issue in *Berman* was "possessed of a congenital disease."  *Berman*, 348 U.S. at 34.

supposedly blighted areas—arose in a poor, largely African-American section of

Washington, D.C.  *See Berman*, 348 U.S. at 30; *Kelo*, 545 U.S. at 522 (Thomas, J.,

dissenting).  And "of the 5,900 units of housing that were constructed on the

[redeveloped] site, only 310 could be classified as affordable to the former

residents of the area."  Pritchett, *supra*, at 46-47.

      "In the decade following *Berman*, urban renewal programs uprooted

hundreds of thousands of people, disrupted fragile urban neighborhoods, and

helped entrench racial segregation in the inner city."  *Id.* at 47.  In fact, "[o]f all the

families displaced by urban renewal from 1949 through 1963, 63 percent of those

whose race was known were nonwhite, and of these families, 56 percent of

nonwhites and 38 percent of whites had incomes low enough to qualify for public

housing, which, however, was seldom available to them."  *Kelo*, 545 U.S. at 522

(Thomas, J., dissenting) (quoting Bernard J. Frieden & Lynne B. Sagalyn,

*Downtown*, *Inc.:  How America Rebuilds Cities* 28 (1989)).

      Even when not part of a "blight" removal project, eminent domain was (and,

as discussed below, continues to be) used to enrich wealthy corporate interests at

the expense of the poor and working class—a point well illustrated by the two

most notorious uses of eminent domain in the last several decades.  "In 1981,

urban planners in Detroit, Michigan, uprooted the largely 'lower-income and

elderly' Poletown neighborhood for the benefit of the General Motors

Corporation." *Id.* (quoting J. Wylie, *Poletown: Community Betrayed* 58 (1989)).

In a scheme to convince General Motors to build a new assembly plant in the area,

the city used eminent domain to acquire and clear over 1,000 buildings, housing

more than 4,200 people. Pritchett, *supra*, at 48-49. The city spent more than $200

million acquiring and preparing the property, which it, in turn, sold to General

Motors for $8 million. *Id.* at 49.[8]

Similarly, the project that the U.S. Supreme Court upheld as a "public use"

in *Kelo* encompassed some 115 homes, small businesses, and other properties in

the working-class Fort Trumbull neighborhood. With the Supreme Court's okay,

the New London Development Corporation demolished the modest neighborhood

as part of a scheme to benefit Pfizer and convince it to build a new research facility

in the city. *See Kelo*, 545 U.S. at 473-75.

The dissenting justices in *Kelo* recognized the majority's decision for

precisely what it was: a green light for cities to displace the poor and working

class with more moneyed interests. As Justice O'Connor warned, "all private

property is now vulnerable to being taken and transferred to another private owner,

so long as it might be upgraded." *Id.* at 494 (O'Connor, J., dissenting). "As for the

---

[8] The Michigan Supreme Court held that the project constituted a public use in
*Poletown Neighborhood Council v. City of Detroit*, 304 N.W.2d 455 (Mich. 1981),
a decision it later overruled in *County of Wayne v. Hathcock*, 684 N.W.2d 765
(Mich. 2004).

Appellate Case: 16-1492    Document: 01019767895    Date Filed: 02/21/2017    Page: 27

victims, the government now has license to transfer property from those with fewer resources to those with more." *Id.* at 505.

Justice Thomas made a similarly dire prediction. "Allowing the government to take property solely for public purposes is bad enough," he noted, "but extending the concept of public purpose to encompass any economically beneficial goal guarantees that these losses will fall disproportionately on poor communities." *Id.* at 521 (Thomas, J., dissenting).

Justices O'Connor and Thomas were right. A national study of the demographics of persons living in 184 areas targeted by eminent domain for private development between 2003 and 2007 (that is, two years before and two years after the *Kelo* decision) revealed that, compared to their surrounding communities, eminent domain project areas included:

- a greater percentage of minority residents (58 percent);

- a greater percentage of persons holding less than a high school diploma (34 percent);

- lower median incomes ($18,935.71); and

- a greater percentage of persons living at or below poverty levels (25 percent).

Dick M. Carpenter & John K. Ross, *Testing O'Connor and Thomas: Does the Use of Eminent Domain Target Poor and Minority Communities?*, 46 Urb. Studs. 2447, 2455 (2009). The study concluded that residents in areas targeted by eminent

domain "are significantly more likely to be minorities, less well off, [and] less

educated." *Id.* These findings are consistent with the substantial body of social

science literature documenting the demographics of those affected by eminent

domain. *Id.* at 2456.

The disproportionate impact of eminent domain on low-income property

owners is hardly surprising. For one thing, "properties are often selected for

eminent domain partially due to their low market values, which dictates the amount

of compensation the government is required to pay upon condemnation." Justin B.

Kamen, *A Standardless Standard: How a Misapplication of* Kelo *Enabled

Columbia University to Benefit from Eminent Domain Abuse*, 77 Brook. L. Rev.

1217, 1222 (2012). And "[a]llowing economic underutilization to be a factor in

determining blight," as Colorado's Urban Renewal Law does,[9] only "perpetuates

this problem." Kaitlyn L. Piper, *New York's Fight over Blight: The Role of

Economic Underutilization in* Kaur, 37 Fordham Urb. L.J. 1149, 1176 (2010).

_____

[9] *See* Colo. Rev. Stat. § 31-25-103(2) (defining "blighted area" to include "an area
that, in its present condition and use, by reason of the presence of at least four of
the following factors, . . . *constitutes an economic . . . liability*, and is a menace to
the public . . . welfare" (emphasis added)); *see also id.* § 31-25-102(1) (finding that
"blighted areas . . . constitute[] an economic . . . liability"); Ilya Somin, *The Limits
of Backlash: Assessing the Political Response to* Kelo, 93 Minn. L. Rev. 2100,
2123–24 (2009) ("Obviously, any obstacle to economic development can easily be
defined as . . . an 'economic . . . liability.'").

### B. The Poor Are Less Able to Obtain Counsel to Advise Them on the Implications of, and Procedures for Defeating, a Blight Designation

Given the disproportionate impact that "blight" designations and eminent domain have on poor communities, the need for truly adequate notice of the meaning of a blight designation and of the time for seeking review of one is all the more important. The poorer a citizen is, after all, the less likely she is to be able to access counsel to advise her on the implications of a blight designation for her property, her procedural options for attempting to defeat the blight designation, and the time within which she must avail herself of those procedural options.[10] Notifying her of the potential consequence of a blight designation (loss of her home) and the time within which she has to fight it is therefore critical.

In fact, empirical research has demonstrated that the poor are much less likely to even *seek* legal advice when confronted with a civil legal need. *See* Sara Sternberg Greene, *Race*, *Class*, *and Access to Civil Justice*, 101 Iowa L. Rev.

---

[10] This is a problem not just for those in poverty, but for the working-class victims of blight designations, as well. *See* Catherine R. Albiston & Rebecca L. Sandefur, *Expanding the Empirical Study of Access to Justice*, 2013 Wis. L. Rev. 101, 109 (2013) (noting that "civil justice problems . . . are ubiquitous . . . among people who are above the poverty line but nevertheless unable to afford a lawyer"); Jeanne Charn, *Legal Services for All: Is the Profession Ready?*, 42 Loy. L.A. L. Rev. 1021, 1045 (2009) (noting that, in access-to-justice research, "[w]e have had a nearly exclusive focus on the very poor at the expense of middle-income people who also cannot afford traditional market-rate lawyer services").

1263, 1265 (2016).[11]  This makes adequate notice of the potentially drastic

consequences of a blight designation all the more important.

     Finally, as noted above, property owners threatened with eminent domain

are more likely to be not just less well off, but also less educated.  *See* Carpenter &

Ross, *supra, at* 2455, 2456.  Thus, they are likely to be less sophisticated in, and

less adept at, researching information such as the availability of eminent domain to

the government, or the limitations period governing judicial review of a blight

designation, for themselves.

     The district court nevertheless found it irrelevant that property owners are

not notified of the fact that a blight designation enables the government to take

their properties by eminent domain, or of the 30-day limitations period for seeking

review of the blight designation.  "[I]t cannot be true that government actions

violate the Due Process Clause when the government fails to inform people of their

rights to judicial review," the court held, because "'[e]very one is presumed to

know the law.'"  Appx. 51 (Order at 13) (quoting *United States v. Friday*, 525 F.3d

---

[11] A national survey by the American Bar Association found that, among low
income individuals experiencing one or more civil legal needs at the time of the
survey, barely a quarter had sought legal advice.  Consortium on Legal Servs. &
the Pub., ABA, *Legal Needs and Civil Justice:  A Survey of Americans* (1994),
http://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_de
fendants/downloads/legalneedstudy.authcheckdam.pdf.  "The predominant reasons
for low-income households not seeking legal assistance were a sense that it would
not help and that it would cost too much."  *Id.*

938, 957 (10th Cir. 2008)).  As the district court blithely declared, "ignorance of

the law is no excuse."  Appx. 52 (Order at 14).

The court's invocation of this maxim is entirely misdirected and an entirely

unsatisfactory answer to the fact that residents whose homes and businesses are

threatened by eminent domain receive no notice of that fact or of the extremely

limited window in which they may defend those homes and businesses.

"Ignorance of the law is no excuse" is a maxim of *criminal* law—one that has been

applied only rarely, and cautiously, in civil contexts.  *Randazzo v. Harris Bank*

*Palatine*, *N.A.*, 262 F.3d 663, 667 (7th Cir. 2001); *see also* Jonathon S. Byington,

*The Challenges of the New Defalcation Standard*, 88 Am. Bankr. L.J. 3, 30 &

n.209 (2014).  And even when it has been applied in civil contexts, it has typically

been in relation to "civil wrongs," such as regulatory offenses and torts.  *See*

Restatement (Third) of Restitution and Unjust Enrichment § 5 reporter's note g

(Am. Law Inst. 2011).

It is one thing to presume knowledge of the laws defining criminal and civil

offenses when a citizen undertakes some affirmative act in violation of those laws

and harms the public.  It is quite another to presume knowledge of a law that

empowers government to take the property of unwitting citizens whose only

"offense" is the wholly passive one of living in an area that the government

believes can be put to "better" use.[12]  It is entirely unreasonable to expect citizens to know that their only meaningful opportunity to challenge the taking of their property may be months—perhaps even years—before the government actually files a condemnation action to take it.  Yet that is precisely how Colorado's Urban Renewal Law operates.  A property owner cannot be "presumed to know [a] law" that is so counterintuitive.  Appx. 51 (Order at 13).

Accordingly, this Court should refuse to presume that property owners who are "significantly more likely to be . . . less well off [and] less educated," Carpenter & Ross, *supra*, at 2455, will know that a "blight" designation gives the government the power to take their homes and that they will have one month—and *only* one month—to contest the designation.

### C.    The Poor Are Less Able to Protect Their Property through the Political Process

The disproportionate impact that "blight" designations and eminent domain have on the poor is relevant for another reason:  "those harmed by takings for economic development and blight remediation are groups with relatively little

---

[12] In fact, in *Lambert v. People of the State of California*, 355 U.S. 225 (1957), the U.S. Supreme Court refused to presume even a criminal defendant's knowledge of the law because the charged offense was the "wholly passive" one of "mere presence in the city" without registering.  *Id.* at 228, 229 (reversing conviction for failure to register as a felon in Los Angeles).  To apply the "ignorance of the law will not excuse" maxim in such a circumstance, the Court held, would violate due process and its "requirement of notice."  *Id.* at 228.

political . . . power" and thus "are in the greatest need of protection by the courts."

Kamen, *supra*, at 1222.  For these citizens, the judiciary is often the *only* thing that

can prevent the government from taking their homes.

Nevertheless, the district court insisted that the political process was

sufficient to protect the rights of property owners in "blighted" areas.  It insisted

that "the proper venue" for their grievances "is the ballot box" and opined that

Glendale's "blight area is not so small that political remedies are unattainable."

Appx. 48, 54 (Order at 10, 16).  "While the number of properties and people

affected is much smaller than the population of Glendale overall," the court

asserted, "the number of people and businesses affected here is large enough to

allow resolution of their grievances through traditional political means without a

court's intervention."  Appx. 48 (Order at 10).

The district court's decision ignores the fact that the political influence of

the low-income property owners who are most commonly impacted by blight

designations and eminent domain is minimal, at best, no matter how large their

numbers.  "[B]light is a vague term" that lends itself to abuse "by the politically

powerful to separate desirable and undesirable land uses."  Piper, *supra*, at 1176.

"Because the poor and minority groups often have the least political power, they

often have scarce resources with which to defend themselves from powerful actors

who control the process."  *Id.*

Justices Thomas and O'Connor recognized as much in their *Kelo* dissents. The "poor communities" that are impacted (indeed, targeted) by eminent domain "are not only systematically less likely to put their lands to the highest and best social use, but are also the least politically powerful," Justice Thomas noted. *Kelo*, 545 U.S. at 521 (Thomas, J., dissenting). Quoting Justice O'Connor's separate dissent, he observed that inadequate judicial scrutiny of eminent domain "encourages 'those citizens with disproportionate influence and power in the political process, including large corporations and development firms,' to victimize the weak." *Id.* at 522 (quoting *Kelo*, 545 U.S. at 505 (O'Connor, J., dissenting)).

In fact, even for those of greater means, political solutions to questionable "blight" designations and other forms of eminent domain abuse are often illusory. Redevelopment agencies that administer urban renewal laws, after all, are often "insulated from political accountability" because they are unelected, "were created to serve private ends," and are frequently "controlled by the interests that created them." Pritchett, *supra*, at 5-6; *see also id.* at 6 n.18 (citing scholarship discussing the problems of "public authorities" like redevelopment agencies). "Because citizens affected by condemnation cannot resort to the political process for help, the only avenue left is judicial redress." Piper, *supra*, at 1174. Adequate notice of the avenue and time for seeking judicial redress is therefore critical.

---◆---

Appellate Case: 16-1492   Document: 01019767895   Date Filed: 02/21/2017   Page: 35

As the Director of the Washington Bureau of the NAACP testified to Congress in the wake of *Kelo*, "condemnations in low-income or predominantly minority neighborhoods are often easier to accomplish because these groups are less likely, or often unable, to contest the action either politically or in our Nation's courts."  *Protecting Property Rights after* Kelo:  *Hearing Before the House Subcomm. on Commerce*, *Trade*, *and Consumer Protection*, 109th Cong. (2005) (testimony of Hilary O. Shelton), http://action.naacp.org/page/-/washington%20bureau/testimonies/Kelo.FINAL.pdf.  Adequate notice is essential to ensure that these communities at least have a chance.

## CONCLUSION

For the forgoing reasons, this Court should reverse the judgment of the district court and hold that Glendale violated the Fourteenth Amendment by not providing adequate notice of the blight designation to MAK.

Respectfully Submitted,

/s/ Michael E. Bindas
Michael E. Bindas
INSTITUTE FOR JUSTICE
10500 NE 8th Street, Suite 1760
Bellevue, Washington  98004
(425) 646-9300
mbindas@ij.org

*Counsel for Amicus Curiae*

Appellate Case: 16-1492    Document: 01019767845    Date Filed: 02/21/2017    Page: 36

# CERTIFICATE OF VIRUS SCAN

I hereby certify that:

1.    All required privacy redactions have been made.

2.    Paper copies of the Brief of Amicus Curiae have been submitted to the court and the ECF submission is an exact copy of the brief.

3.    The Brief of Amicus Curiae has been scanned for viruses using [Webroot Secure Anywhere, Version v9.0.9.78, updated August 2, 2016], and according to the program is free of viruses.

Dated: February 21, 2017                    /s/ Michael E. Bindas
                                                                          *Counsel for Amicus Curiae*

Appellate Case: 16-1492    Document: 01019763495    Date Filed: 02/21/2017    Page: 37

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(g)(1) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,455*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: February 21, 2017                    /s/ Michael E. Bindas
                                            *Counsel for Amicus Curiae*

Appellate Case: 16-1492    Document: 010197673495    Date Filed: 02/21/2017    Page: 38

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 21st day of February, 2017, I caused this Brief of

Amicus Curiae to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

> Timothy G. Atkinson
> Russell W. Kemp
> James R. Silvestro
> IRELAND STAPLETON PRYOR & PASCOE
> 717 17th Street, Suite 2800
> (303) 623-2700
>
> *Counsel for Appellant*
>
> Lianna Bash
> Michael Onufer
> R. Alexander Pilmer
> KIRKLAND & ELLIS
> 333 South hope Street, Suite 2900
> Los Angeles, California  90071
> (213) 680-8405
>
> *Counsel for Appellant*
>
> Jason Astle
> Matthew R. Giacomini
> Jeffrey A. Springer
> Michael P. Zwiebel
> SPRINGER & STEINBERG, P.C.
> 1600 Broadway, Suite 1200
> Denver, Colorado  80202
> (303) 861-2800
>
> *Counsel for Appellees*

Appellate Case: 16-1492    Document: 01019767895    Date Filed: 02/21/2017    Page: 39

I further certify that on this 21st day of February, 2017, I caused the required number of bound copies of the foregoing Brief of Amicus Curie to be filed, via UPS Next Day Air, with the Clerk of this Court.

/s/ Michael E. Bindas
*Counsel for Amicus Curiae*